IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

RICARDO FLORES,                                        Index No. 16-cv-09728-WHP

                          Plaintiff,                   SECOND AMENDED
                                                       COMPLAINT

                                                       ECF CASE

            -against-


THE CITY OF NEW YORK ;                                 **<u>Jury Trial Demanded</u>**
NYPD DETECTIVE JASON PETRI;
NYPD UNDERCOVER OFFICER UC CO125;
NYPD DET. RONALD LUPARELLO
(Tax ID 916088); NYPD SGT. DUPLESSIS; NYPD
DET. MEADE;  NYPD DET. ALEXAKIS; NYPD
DET.  ROJAS; NYPD DET. KRUT; SEAN O'GRADY;
STEPHEN ASIEDU, MD; ERICA SMALLWOOD, RN;
MARVIN RIVIERE; CO 13085; CORIZON HEALTH
CLINICAL SOLUTIONS, LLC.; CORRECTIONAL
MEDICAL ASSOCIATES OF NEW YORK, P.C.;
DAMIAN FAMILY CARE CENTERS, INC.;
CORRECTIONAL OFFICER DOES 1 – 4; MEDICAL
DOES 1-8; NYPD POLICE OFFICERS "JOHN DOES" 1-2.

                          Defendants.
------------------------------------------------------------X


        Plaintiff RICARDO FLORES, by his attorney, WYLIE M. STECKLOW, of

Stecklow & Thompson, complaining of the defendants, respectfully alleges as follows:

## I.     PRELIMINARY STATEMENT

        1.      This is a civil rights action in which the plaintiff seeks relief for the

injuries he suffered.  On June 26, 2015, Ricardo Flores was arrested by the defendant

police officers.  Although Mr. Flores did not resist arrest, the officers beat him severely,

breaking his jaw.  As a result of the arrest, Mr. Flores was held in custody for eight

months.  During that time, he lacked access to adequate medical care for his injuries.

1

Mr. Flores's injuries were the result of violation of rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983; by the United States Constitution, including its Fourth, Eighth and Fourteenth Amendments. The plaintiff seeks damages, both compensatory and punitive, an award of costs and attorneys' fees, and such other and further relief as this court deems equitable and just.

2.      Plaintiff's claims arise from a violent arrest in June 2015, that resulted in a broken jaw, followed shortly thereafter by a term of incarceration as a pre-trial detainee and then as a post-conviction prisoner, wherein employees of the New York City Department of Corrections ("DOC"), Damian Family Care Centers, Inc., Corizon Health Clinical Solutions, LLC, Correctional Medical Associates of New York, P.C., acting under color of law, were deliberately indifferent and negligent to Plaintiff's serious medical needs, deprived him of his right to substantive due process and harmed him by a policy of neglect and lack of oversight in providing medical treatment to inmates such as the plaintiff.

## II.      JURISDICTION

3.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as other Constitutional provisions. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4).

4.      Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action.

## III.      VENUE

5.      Venue is proper for the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. §1391(b)(1) because the events complained of occurred within this district.

## IV.    JURY DEMAND

6.      Plaintiff respectfully demands a trial by jury for all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V.    THE PARTIES

7.      Plaintiff Ricardo Flores is a citizen of the United States who resides in Queens County, New York.

8.      The City of New York ("City") is a municipal corporation organized and existing under the laws of the State of New York.

9.      Defendant THE CITY OF NEW YORK maintains the New York City Police Department ("NYPD").

<u>THE NYPD DEFENDANTS</u>

10.      At all times relevant to this action, DETECTIVE JASON PETRI was an officer of the NYPD, and was acting under the supervision of said department and within the scope of his/her official duties.

11.      At all times relevant to this action, NYPD UNDERCOVER OFFICER UC CO125 ("UC CO125") was an officer of the NYPD, and was acting under the supervision of said department and within the scope of his/her official duties.

12.      At all times relevant to this action, NYPD SGT DUPLESSIS was an officer of the NYPD, and was acting under the supervision of said department and within the scope of his/her official duties.

13.     At all times relevant to this action, NYPD DET. RONALD LUPARELLO (Tax ID 916088) was an officer of the NYPD, and was acting under the supervision of said department and within the scope of his/her official duties.

14.     At all times relevant to this action, NYPD DET. MEADE was an officer of the NYPD, and was acting under the supervision of said department and within the scope of his/her official duties.

15.     At all times relevant to this action, NYPD DET. ALEXAKIS was an officer of the NYPD, and was acting under the supervision of said department and within the scope of his/her official duties.

16.     At all times relevant to this action, NYPD DET. ROJAS was an officer of the NYPD, and was acting under the supervision of said department and within the scope of his/her official duties.

17.     At all times relevant to this action,  NYPD DET. KRUT was an officer of the NYPD, and was acting under the supervision of said department and within the scope of his/her official duties.

18.     At all times relevant to this action, Defendants NYPD POLICE OFFICERS "JOHN DOES" 1-2 were officers of the NYPD, and were acting under the supervision of said department and within the scope of his/her official duties.

## THE DEPARTMENT OF CORRECTIONS DEFENDANTS

19.     At all times relevant to this action, Defendants CORRECTIONS OFFICER DOES  1-6 ("C.O. Does") were corrections officers, and were acting under the supervision of the New York City Department of Corrections and within the scope of his/her official duties.

20.     As alleged elsewhere herein, Defendant C.O. Does 1-2 approved or caused the transfer of Mr. Flores from Bain Correctional Center to Rikers Island without ensuring that he would receive appropriate medical attention.

21.     As alleged elsewhere herein, Defendants, C.O. Does 3 – 4  are the individuals who approved or caused the transfer of Mr. Flores from Rikers Island to Ulster Correctional Facility without ensuring that he would receive appropriate medical attention.

22.     At all times relevant to this action, the Defendant Police Officers and Defendant Correction Officers, either personally or through their subordinates, were acting under color of state law and/or pursuant to the rules, customs, usages and/or practices of the State or City of New York.

THE CORIZON DEFENDANTS

23.     Defendant CORIZON HEALTH, INC.is a corporation that contracted with The City of New York to provide health services to pretrial detainees in the custody of the DOC.  Corizon Health, Inc. engages in business in the State of New York and is subject to personal jurisdiction in this district, and provided health care services on behalf of The City of New York.

24.     Defendant CORRECTIONAL MEDICAL ASSOCIATES OF NEW YORK, P.C. is a professional corporation that contracted with The City of New York to provide health services to pretrial detainees in the custody of the DOC.  Correctional Medical Associates of New York, P.C. engages in business in the State of New York and is subject to personal jurisdiction in this district, and provided health care services on behalf of The City of New York.

25.     Upon information and belief, Defendant CORIZON HEALTH CLINICAL SOLUTIONS, LLC is a limited liability corporation that contracted to provide health services to pretrial detainees in the custody of the DOC, including all detainees at Rikers Island.  Corizon Health Clinical Solutions, LLC, engages in business in the State of New York and is subject to personal jurisdiction in this district, and has provided health care services on behalf of The City of New York.

26.     Collectively, CORIZON HEATH, INC., CORIZON HEALTH CLINICAL SOLUTIONS, LLC, CORIZON, INC., and CORRECTIONAL MEDICAL ASSOCIATES OF NEW YORK, P.C. will be referred to as ("Corizon").

<u>THE DAMIAN DEFENDANT</u>

27.     Defendant DAMIAN FAMILY CARE CENTERS, INC. ("Damian") is a New York Corporation with a principal place of business at 138-02 Queens Boulevard, Queens, New York.

28.     Defendant Damian Family Care Centers, Inc. is a corporation that contracted with the City of New York to provide health services to pretrial detainees in the custody of the DOC at Bain Center.

<u>Individual Medical Defendants</u>

29.     Defendant DOCTOR STEPHEN ASIDEU was an employee of Damian.

30.     Dr. Asideu was an employee of Corizon, whose medical designation is unknown.

31.     Defendant SEAN O'GRADY was an employee of Damian, whose medical designation is unknown.

32.     In the alternative, Defendant SEAN O'GRADY was an employee of Damian, whose medical designation is unknown.

33.     Sean O'Grady was an employee of Corizon whose medical designation is unknown.

34.     Defendant ERICA SMALLWOOD, RN was an employee of Damian.

35.     In the alternative, Defendant ERICA SMALLWOOD, RN  was an employee of Corizon.

36.     Defendant MARVIN RIVIERE was an employee of Damian, whose medical designation is unknown.

37.     In the alternative, Defendant MARVIN RIVIERE was an employee of Corizon, whose medical designation is unknown.

38.     Defendant CO 13805, whose full name is not currently known, was an employee of Damian.  In the records disclosed in this case, the difficult to decipher handwriting might indicate a name of Hicks.

39.     Defendant CO 13805, whose full name is not currently known, was an employee of Corizon.  In the records disclosed in this case, the difficult to decipher handwriting might indicate a name of Hicks.

40.     Defendants MEDICAL DOES 1 – 2 are the individuals who failed to allow Mr. Flores to receive appropriate treatment while at Vernon C. Bain Center, and approved or caused the transfer of Mr. Flores from the Vernon C. Bain Center to Riker's Island.

41.     As alleged elsewhere herein, Defendant MEDICAL DOES 3 – 4 were unresponsive to the medical needs of Mr. Flores at Rikers Island.

42.     As alleged elsewhere herein, Defendant MEDICAL DOES 5-6 were unresponsive to the medical needs of Mr. Flores at Ulster Correctional Facility.

43.     As alleged elsewhere herein, Defendant MEDICAL DOES 7-8 were unresponsive to the medical needs of Mr. Flores at the Willard Drug Treatment facility.

44.     Dr. Asideu, Nurse Smallwood, Mr. Riviere, Mr. O'Grady, CO 13805, and all Defendant Medical Does are referred to collectively as the ("Individual Medical Defendants").

45.     The Individual Medical Defendants were at all times relevant herein employees or agents of Corizon, Damian and/or the City of New York, and were acting under color of state law in the course and scope of their duties and functions as agents, servants, and employees of Corizon, Damian and/or the City of New York and otherwise performed and engaged in conduct incidental to their lawful functions in the course of their duties.  They were acting for and on behalf of Corizon, Damian and/or the City of New York at all times relevant herein, with the power and authority vested in them as agents and/or  employees of Corizon, Damian and/or the City of New York and incidental to their duties as agents and employees of Corizon, Damian and/or the City of New York.  They are sued in their individual capacities.

<u>REAL NAMES OF DOE DEFENDANTS WILL BE IDENTIFIED</u>

46.     The true and complete names, ranks, titles and shield numbers of defendants C.O. Does, Medical Does and NYPD Does are not currently known. However, these individual defendants were employees or agents of Corizon, Damian and/or the City of New York on the dates of the incidents.  Accordingly, they may be entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York State General Municipal Law §

50-k. The Law Department, then, is hereby put on notice (a) that Mr. Flores intends to name said individuals as defendants in an amended pleading once their true and complete name, rank, and shield number become known and (b) that the Law Department should immediately begin preparing their defense(s) in this action.

<u>DEFENDANTS' RECKLESSNESS, AIDING & ABETTING LIABILITY,</u>
<u>AND OFFICIAL STATUS</u>

47.      The Defendants' acts hereafter complained of were carried out intentionally, recklessly, or with malice, and or a gross disregard for Mr. Flores's rights, person, and humanity.

48.      The Defendants' acts hereafter complained of were carried out in violation of the duty of care owed to Mr. Flores.

49.      At all relevant times, the Defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

50.      All claims against all defendants other than Defendant THE CITY OF NEW YORK are asserted against said defendants in both their individual and official capacities.

**VI.    FACTS COMMON TO ALL CLAIMS**

<u>THE PLAINTIFF'S  ARREST AND UNLAWFUL</u>

<u>INJURY BY POLICE</u>

51.      Upon information and belief, on June 26, 2015, Ricardo Flores was arrested by NYPD DETECTIVE JASON PETRI, NYPD UNDERCOVER OFFICER UC CO125,  NYPD DET. RONALD LUPARELLO (Tax ID 916088), NYPD SGT .DUPLESSIS, NYPD DET. MEADE,  NYPD DET. ALEXAKIS, NYPD DET. ROJAS,

NYPD DET. KRUT, NYPD POLICE OFFICERS "JOHN DOES" 1-2 (the "Defendant Police Officers").

52.    As Ricardo Flores was being arrested, he tried to explain to the Defendant Police Officers that they were arresting the wrong person, and he had not done anything wrong.

53.    The Defendant Police Officers did not like this.

54.    One Defendant Police Officers punched Ricardo Flores several times in the face.

55.    Ricardo Flores was thrown to the ground and handcuffed.

56.    The Defendant Police Officers continued to punch Ricardo Flores in the face.

57.    As a result, Ricardo Flores' lower right jaw was broken, he had a gash in his head and deep abrasions on his knees.

<u>INTITIAL TREATMENT FOR FLORES' BROKEN JAW</u>

<u>IS AT QUEENS HOSPITAL CENTER;</u>

<u>FOLLOW UP CARE IS PLANNED</u>

58.    On June 26, 2015, while in custody of the NYPD, Mr. Flores received medical treatment at Queens Hospital Center.

59.    A CT scan taken at this facility indicated that on his right side, Mr. Flores had a badly fractured jaw requiring a surgical follow up to properly repair this break. The CT report states the impression as: "Comminuted displaced fracture with foreshortening of the right subcondylar mandible with inferior anterior displacement of the right condylar head in relation to the TMJ."

60.     The Queens Hospital Center discharge papers indicated that Mr. Flores was to "keep a soft diet (such as yogurt, apple sauce, oatmeal, juice, soup, etc.)."  Further, the discharge papers identified an appointment at 10:00 am on July 1, 2015 at the Oromaxillofacial Surgery clinic.

61.     After being discharged, Mr. Flores was eventually arraigned and released from custody.

<u>FLORES DENIED A FAIR HEARING<br/>BY OFFICERS' FALSE ACCUSATIONS</u>

<u>FLORES IS VIOLATED AND HIS PAROLE REVOKED</u>

62.     At his arraignment, charges were formally leveled against Flores.

63.     In documents submitted to the District Attorneys' Office, Defendant Petri made false statements concerning Ricardo Flores' conduct, or allowed such false statements to be made, which falsely accused Ricardo of resisting arrest by, among other things, supposedly punching and kicking the arresting officers.

64.     In particular, Defendant Jason Petri swore out a criminal complaint containing such statements.

65.     Defendant Undercover Officer UC CO125 also provided false information, which he knew would be placed in a criminal complaint against Ricardo Flores, stating that Ricardo was involved in a drug sale transaction.

66.     Prior to July 1, 2015, following the rules of his parole, Mr. Flores reported to his parole officer who violated Flores' parole based upon this arrest, causing Mr. Flores to be taken into custody of the DOC.

67.     The false statements made in the criminal proceeding by Defendants Jason Petri, Undercover Officer UC CO125, and were included as evidence placed before the

parole tribunal which determined whether to revoke Ricardo Flores' parole, and decided how long to hold Ricardo in additional custody.

68.     Relying on the truth of these false statements, the tribunal revoked Ricardo Flores' parole.

69.     As a result, Ricardo Flores was subjected to multiple false charges, and was forced to plead guilty to a charge and to a parole violation related to the arrest.

<u>CORRECTIONS DEFENDANTS</u>
<u>IGNORE FLORES' UNTREATED BROKEN JAW</u>

70.     As a result of his arrest, and the plea bargain offered, Ricardo Flores spent 8 months in custody.

71.     Ricardo Flores was held in five different locations during that time.

72.     As a result of being in custody, Ricardo Flores did not receive adequate or sufficient medical care or pain management.

73.     The plaintiff suffered physical pain, mental and emotional pain, anguish and fear.

74.     The harm caused by these injuries was further exacerbated by the failure of the individual medical defendants, C.O. Does, and Medical Does to provide proper medical treatment to Mr. Flores

75.     Defendants C.O. DOES  1-6 failed to ensure that the plaintiff was provided adequate medical treatment, including pain management and other treatment for his broken jaw.

76.     The individual medical defendants and Medical "JOHN DOES" 1-8 failed to ensure that the plaintiff was provided adequate medical treatment, including pain management and other treatment for his broken jaw.

<u>FLORES IS HELD WITHOUT TREATMENT</u>

<u>AT THE VERNON C. BAIN CORRECTIONAL CENTER</u>

77.     On July 1, 2015, Mr. Flores was being held at the Vernon C. Bain Correctional Center ("Bain Center") in Bronx, New York.

78.     At that time, medical treatment at the facility was subcontracted by the Damian firm.

79.     All Individual Medical Defendants at the Bain Center made decisions concerning Flores' treatment in the manner the Damian firm dictated.

80.     The Damian firm was primarily concerned with controlling costs.

81.     Damian reduced the number and quality of medical staff, medical equipment, and medical treatments provided to the inmate population in order to reduce costs.

82.     Knowing that effective medical diagnosis and treatment in a prison environment is significantly more difficult than in society at large, Damian knew that cost-cutting would endanger the lives and health of inmates like Mr. Flores.

83.     At the Bain Center, Mr. Flores had an intake with Dr. Stephen Asiedu.

84.     The Bain Center intake records indicate that Mr. Flores had been seen at the Queens Hospital, for is fractured jaw, less than a week earlier.  Dr. Asiedu and the Damian Defendants knew that this injury existed and required treatment.

85.     As part of the intake, Dr. Asiedu erroneously noted that there was a Left side jaw fracture in June 2015.  (In fact, Mr. Flores's fracture was on the right side).

86.     Dr. Asideu did not order a special diet of soft food which was necessary for Mr. Flores to eat in his condition.

87.     Dr. Asidedu and the DOC had actual notice and/or knowledge of Mr. Flores's injury and need for treatment and related accommodations.

88.     At the end of the intake record, it indicates that Mr. Flores was released into general population. Instead of the medical facility more appropriate for his condition.

89.     There was no follow up or any other indication that Dr. Asiedu or the DOC developed an appropriate medical plan to treat the broken jaw noted by Dr. Asiedu.

90.     On the same date, July 1, 2015, Nurse Smallwood Also reated Mr. Flores. This treatment included urine drug screening.

91.     On the same date, July 1, 2015, Marvin Riviere treated Mr. Flores.  This treatment included taking blood for testing.

92.     On the same date, July 1, 2015, CO 13805 treated Mr. Flores.  This treatment included conducting a suicide prevention screening.

<u>FLORES IS TRANSFERRED TO RIKERS ISLAND:<br>CORIZON</u>

93.     On or about July 5, 2015, Mr. Flores was transferred from Bain Center to Rikers Island.

94.     On July 6, 2015, Sean O'Grady conducted a review of Mr. Flores's charts, including the intake history and physical taken on July 1, 2015 at Bain Center.

95.     After reviewing the Bain Center records that noted Flores' very recent jaw fracture, with deliberate indifference Sean O'Grady FAILED to order the medically necessary special diet for Mr. Flores.

96.     After reviewing the Bain Center records that noted Flores' very recent jaw fracture, with deliberate indifference Sean O'Grady FAILED to develop a medically

appropriate plan for Mr. Flores's injury.  Indeed, upon information and belief, no plan for treatment of any kind was made.

### FLORES SUFFERS PERMANENT PARTIAL DISABILITY AS A RESULT OF THE DEFENDANTS' MEDICAL INDIFFERENCE

97.     Weeks of inadequate or non-existent treatment resulted Mr. Flores' jaw healing improperly, so that Mr. Flores experiences discomfort with normal movements such as eating and speaking.

### THE POLICIES OF DEFENDANTS CITY OF NEW YORK, CORIZON AND DAMIAN CAUSED THE DEFENDANTS' MEDICAL INDIFFERENCE TO FLORES' INJURY

98.     In negligently hiring, training and/or supervising the aforementioned officers, and in all other ways, the City of New York, its agents servants, and employees were negligent, careless and reckless.

99.     The City of New York, Corizon and Damian had policies, practices, customs, usages in place that caused inmates like Ricardo Flores to needlessly suffer continued pain and harm from a recognized serious medical need.  Such policies have caused further harm to Mr. Flores.  By following such policies, the City of New York, Corizon and Damian were deliberately indifferent to Plaintiff's serious medical needs.

100.     The City of New York, Damian and Corizon were also deliberately indifferent to the serious medical needs of Mr. Flores by failing to properly oversee the hiring and training of the medical staff, and failing to implement jail policies, practices, customs, and usages that adequately address the obvious and known health and safety risks to inmates entering Bain Center, Rikers Island, Ulster Correctional Facility, with a known serious medical injury requiring serious medical needs and attention.

15

101.    The City of New York, Damian and Corizon were also deliberately indifferent to the serious medical needs of Mr. Flores by failing to ensure the proper diagnosis and treatment of Mr. Flores while under their care, custody as well as for failing to ensure medically necessary continuity of care when Mr. Flores was transferred among facilities.

## FIRST CLAIM

## EXCESSIVE FORCE

102.    The plaintiff restates all allegations of this Complaint herein.

103.    Without having reasonable cause to do so, Defendant Police Officers used excessive force on the plaintiff.

104.    Upon information and belief not every defendant police officer was involved in the use of excessive force on Mr. Flores, however, until further information is obtained to identify the officers involved in the use of excessive force, this claim should apply to all police officer defendants and NYPD John Doe Defendants.

105.    As a result, plaintiff suffered personal injuries, loss of liberty, emotional distress, and other harms.

106.    As a result of Defendants' conduct, plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

107.    The plaintiff restates all allegations of this Complaint herein.

108.    By their conduct and actions in using excessive force in arresting Mr. Flores and thereafter, failing to provide medical treatment to Ricardo Flores, who was

suffering from a known serious medical condition, and by their denials of his grievances, and by failing to intercede to prevent the complained of conduct, the Defendants, acting under color of law, and without lawful justification and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of decedent's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth, Eighth and Fourteenth Amendments.

109.    Defendants were deliberately indifferent to Plaintiff's serious medical needs when, knowing Plaintiff was suffering from a diagnosed broken jaw, they refused to attend to Plaintiff's serious medical needs and denied him proper and necessary care.

110.    Defendants' deliberate indifferent to Plaintiff's serious medical needs was the proximate cause of the mental anguish and physical pain suffered by Plaintiff.

111.    Defendants acted under color of law and conspired to deprive Plaintiff of his civil, constitutional and statutory rights to due process under the Fourteenth Amendment, and against cruel and inhuman punishment under the Eight Amendment, to the United States Constitution, and are liable to Plaintiff under 42 USC 1983.

112.    The acts were carried out by the Defendant Police Officers in their capacities as officers of the NYPD pursuant to the customs, usages, practices, procedures, and the rules of Defendant The City of New York and the NYPD, all under the supervision of ranking officers of said department.

113.    The acts of the individual medical defendants were carried out in their capacities as agents, and/or employees of Damian, Corizon,  and/or the City of New York and/or as medical professionals.

114.    As a result, plaintiff suffered personal injuries, loss of liberty, emotional distress, and other harms.

115.    Plaintiff has been damages as a result of Defendants' wrongful acts.

116.    As a result of Defendants' conduct, plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### THIRD CLAIM FOR RELIEF

**LIABILITY OF
CORIZON
FOR CONSTITUTIONAL VIOLATIONS**

117.     The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

118.     At all times material to this complaint, defendant Corizon had de facto policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

119.     Corizon is a company which seeks to maximize profit by minimizing the cost of and not providing needed health care.

120.     The complained of unconstitutional policies that caused injury to Mr. Flores include, the failure to train, supervise, and discipline employees, the provision of constitutionally inadequate medical care, the failure to adequately review decisions at intake and to transfer inmates with serious known medical conditions without adequate attention to their medical needs, the intake and transfer of inmates without appropriate limitations on where they would thereafter be housed, the intake and transfer of inmates without adequate evaluation of where they would thereafter be housed, and the failure to adequately review intake records concerning inmates with serious known medical

conditions or have such review conducted by a person with sufficient institutional and medical training and knowledge.

121.    At the time of Mr. Flores's intake and subsequent transfer, as The City of New York knew or should have known, Corizon's medical providers nationwide routinely failed to conduct adequate rounds or clinical examinations of their patients, routinely failed to accurately maintain or review patients' charts, and routinely denied patients access to needed doctors and medication, all of which placed the health and lives of Corizon's patients at risk. These are the very policies, practices and customs that have harmed Mr. Flores.

122.    The aforementioned customary and known practices resulted from cost-cutting measures adopted by Corizon to maximize profits by, among other things, inadequately staffing facilities, employing unqualified staff, failing to train or vet staff, and delaying and denying life-saving care even in emergency situations.

123.    Corizon is a for-profit, billion-dollar company that was formed in 2011 when its predecessor, Correctional Medical Services, Inc. ("CMS"), merged with PHS Correctional Healthcare ("PHS"). Under each of these names, Corizon has had a long and well publicized history of sacrificing the health and lives of inmates for profit. Corizon, which operates in hundreds of correctional facilities in dozens of states, uses the same profit-maximizing approach nationwide: "[T]heir whole goal," one Arizona judge has observed, "is how not to do any work."[1]

---

[1] Arizona prisons in health-care quandary, Bob Ortega - Feb. 16, 2012 11:05 PM, The Republic, available at: azcentral.com - http://archive.azcentral.com/arizonarepublic/news/articles/20120210arizona-prisons-health-care-quandary.html.

[2] Michael Winerip and Michael Schwirtz, *New York City to End Contract With Rikers Health Care Provider*, N.Y. Times (June 10, 2015), https://www.nytimes.com/2015/06/11/nyregion/report-details-

124.    Three years before Mr. Flores was improperly treated by Corizon, the Eleventh Circuit affirmed a jury finding that Corizon pursues a policy of denying medical treatment to inmates, and even refusing to send prisoners on the brink of death to hospitals, in order to save money. In *Fields v. Corizon Health, Inc.*, 490 F. App'x 174 (11th Cir. 2012), the jury confirmed that this policy had caused the gruesome suffering and permanent paralysis of Brett Fields. Mr. Fields had complained of a severe bacterial infection for several weeks, but a PHS nurse refused to send him to the hospital and instead gave him Tylenol even as his legs began to twitch, he lost his ability to walk, and his intestines descended out of his rectum. The Eleventh Circuit affirmed the jury's finding that Mr. Fields's anguish resulted from PHS's policy of "delay[ing] treatment to save money," which it "implemented . . . with deliberate indifference as to the policy's known or obvious consequences" for the company's patients. *Id*. at 184-85 (internal quotation marks and alterations omitted).

125.    According to published reports, Jovon Frazier likewise died because of Corizon's profit-seeking practice of denying patient detainees access to outside doctors or facilities, or even to Corizon doctors or physicians assistants. Despite months of persistent and increasingly desperate complaints of severe pain, Mr. Frazier was allowed to see only nurses and never a doctor, and he was offered no treatment other than Tylenol. When he was finally taken to a hospital, a cancerous mass was discovered in his shoulder. It cost him first his left arm and then, in September 2011, his life. A 2014 investigation by the Palm Beach Post revealed that Mr. Frazier was only one of numerous Florida prisoners—Donna Pickelsimer, Anthony Carvajal, and Tammie White among

them—whose end-stage cancer symptoms were disregarded by Corizon employees and treated with Tylenol and ibuprofen.

126.    In Florida, a 2015 investigation into Corizon's medical care at the Florida Women's Reception Center in Ocala found that a woman with diabetes had gone almost three months without insulin, inmates at risk of self-harm were denied psychiatric care while being held in isolation far longer than regulations allowed, and mentally ill inmates were inexplicably taken off their prescribed psychiatric medications.

127.    By January 2013, approximately 100 days after Florida turned over healthcare for the vast majority of its inmates to Corizon, the monthly inmate death count shot to a ten-year high, while the number of critically ill prisoners sent for hospital treatment plummeted. These were far from the only victims of Corizon's inhumane penny-pinching practices.

128.    Audits and reviews of Corizon in other states reflect the same custom and policy of providing substandard care to cut costs. A February 2012 report of Corizon's performance in Idaho concluded that the company was deliberately indifferent to the medical needs of prisoners. Just as Mr. Flores's medical needs were not being seriously considered, terminally ill and long-term care prisoners in Idaho were left on soiled linens, given inadequate pain medication, and forced to endure long periods without food or water. Responses to prisoners' requests for medical attention were delayed, or their requests were entirely ignored; the same was true in emergency care situations, as inadequately trained staff working without the supervision of registered nurses or physicians were slow to respond. The Idaho report found Corizon staffing inadequate and incompetent, and mental healthcare deficient. Corizon staff kept incomplete records and

failed to follow up with patients or provide face-to-face evaluations of individuals

prescribed psychotropic medications. Corizon's operations in Idaho failed 23 of 33 audit

categories in 2010 and 26 of 33 categories in 2011.

129.     Similar deficiencies were found in a November 2011 audit of CMS's

performance in Maine prisons: 38% of patient files had inadequate or inaccurate

documentation or were inadequately maintained; 11% of sick calls were never or not

timely resolved; staff was inadequately trained; and medications were routinely

improperly administered. When Maine refused to renew Corizon's contract in 2012,

prisoner complaints about their medical care precipitously dropped.

130.     A 2014 report detailing failures of medical care by Corizon in Alabama

prisons attributed multiple deaths and serious injuries to "extraordinary understaffing,"

which caused crises including the failure to monitor diabetic patients and slow or

nonexistent emergency responses.

131.     The Alabama report echoes one from Arizona issued in October 2013,

which likewise details cases of Corizon's neglect and mistreatment of inmates. In

surveys, Corizon nurses in Arizona confirmed the blistering contents of the report,

relating that patients were deprived of urgent medical care because facilities were

understaffed and the limited medical personnel who were available were inadequately

trained.

132.     Meanwhile, in September 2013, Louisiana canceled its contract with

Corizon, and six Corizon employees subsequently resigned in light of seven health-care

related deaths that occurred in the state's prisons over as many months in 2012. At least

three of the deaths were preventable. On August 8, 2012, Samantha George, a severe

diabetic also suffering from a bacterial infection, died after complaining of fever and pain. While Ms. George lay in her cell partially naked and unresponsive, Corizon staff repeatedly peered into her cell but did nothing to assist her. The only doctor on duty was off-site and told the nurse who contacted him that he would examine Ms. George the following day. By then, Ms. George was dead.

133.    Corizon and CMS's pattern of delayed or denied medical care killed at least nine additional people and caused serious or critical injuries to 21 others in Minnesota before the state cancelled its contract with Corizon in 2013. A 2014 audit of Corizon's performance in Minnesota found that the deaths and injuries were in large part attributable to inadequate staffing. In order to cut costs, on weekdays after 4:00 p.m. and on weekends, Corizon paid a single doctor to be on call for the entire state prison system.

134.    According to published accounts, one Minnesota victim of this policy was Xavius Scullark-Johnson, a schizophrenic man. In May 2013, Mr. Scullark-Johnson suffered seven seizures in his cell, where he was left for nearly eight hours with no care. He was found soaked in urine on the floor of his cell, but still no ambulance was called for several more hours. When the ambulance finally arrived, a Corizon nurse turned it away because allowing Mr. Scullark Johnson to travel by ambulance to a hospital would have violated Corizon protocols designed to cut costs. Without access to hospital care, Mr. Scullark-Johnson soon died.

135.    Lawsuits throughout the country, in Alabama, Arizona, California, Forida, Idaho, Indiana, Iowa, Louisiana, Maine, Minnesota, Missouri, New Mexico, and New York, among other states, detail what one D.C. municipal lawmaker identified in 2015 as Corizon's "deeply troubling track record of human rights abuses."

136.     As The City of New York was contracting with Corizon to care for Mr. Flores and his fellow inmates, other states were cancelling their contracts with Corizon one by one, faced with the suffering and death that Corizon's cost-cutting measures produced. Corizon lost contracts with state prisons in Vermont (2005), Alabama (2007), Delaware (2010), Maryland (2010), and Maine (2012), and with county jails in Galveston, Texas (2007), Pima County, Arizona (2008), and Monroe County, New York (2010), almost always following allegations by officials that the company was not providing adequate healthcare. These contract terminations were followed by others in Minnesota, Pennsylvania, Tennessee, Washington, D.C., and Volusia County, Florida, among other jurisdictions.

137.     The City of New York, meanwhile, waited until 2015 before reevaluating its contract with Corizon. Between 2009 and 2015, Corizon's provision of substandard medical care had been found by The New York State Commission of Correction (SCOC) to have caused up to a dozen deaths at Rikers. By the time The City of New York cancelled its contract with Corizon, it was too late for those dozen individuals, or Mr. Flores. The City of New York was deliberately indifferent to the known, well-publicized and widely decried unconstitutional policies, practices, and customs of Corizon, and this delay and deliberate indifference caused harm to Mr. Flores.

138.     At the time of Mr. Flores's treatment, Corizon knew that its deliberate strategy of cutting costs to maximize profits placed those in its care at serious risk of grave illness by among other things, understaffing facilities, inadequately screening and training employees, and denying patients access to needed care. The City of New York likewise knew or should have known of Corizon's  practices, but they disregarded the

wellbeing of the individuals in their custody, with harmful consequences for Mr. Flores, among so many others.

139.    At all times material to this complaint, defendant Corizon was deliberately indifferent to its failure to provide adequate medical care for inmates held in DOC custody.

140.    At all times material to this complaint, defendant Corizon failed to properly train, screen, supervise, or discipline employees, and failed to inform the Individual Defendants' and their supervisors of their need to train, screen, supervise or discipline employees.  For decades, through Department reports, civil litigation, and media reports, the DOC has been aware of the routine, dangerous, and constitutionally inadequate medical care.

141.    At the time of Mr. Flores' mistreatment, the City of New York had already decided to cut ties with Corizon , based largely in part on the results of the NYC Department of Investigation into Corizon.[2]

142.    On June 10, 2015, The City of New York announced it would not renew the contract they had with Corizon.[3]  This was less than one month before Mr. Flores's was harmed by inadequate and unconstitutional medical care provided by Corizon at Rikers. Yet, this was many years after The City of New York was aware of the inadequate and unconstitutional medical care provided by Corizon at Rikers.

143.    New York City Department of Investigation Commissioner Mark G. Peters said, "DOI's investigation found that Corizon did not provide adequate screening

[2]Michael Winerip and Michael Schwirtz, *New York City to End Contract With Rikers Health Care Provider*, N.Y. Times (June 10, 2015), https://www.nytimes.com/2015/06/11/nyregion/report-details-failings-of-corizon-rikers-island-health-provider.html?_r=0
[3]Jillian Jorgensen, *City Drops Corizon, Rikers Island Health Provider, Amid Scrutiny*, Observer.com(June 10, 2015), http://observer.com/2015/06/city-drops-corizon-rikers-island-health-provider-amid-scrutiny/

or supervision of its employees, and the City did not properly oversee this taxpayer-funded vendor, ignoring multiple red flags."[4]

144.     As described above, Corizon, through its officers and employees, acting under the pretense and color of law, deliberately implemented a nationwide pattern and practice of delaying treatment, inadequately staffing facilities, hiring unqualified personnel, and failing to adequately train personnel in order to cut costs and maximize profits. Corizon implemented its policies with deliberate indifference as to their known, obvious, and proven consequences for patients: serious injury resulting from delayed, denied, and improper treatment. Corizon's policies, practices, and customs were proximate causes of Mr. Flores's continued harm.

145.     Corizon had a policy or practice of failing to ensure that inmates with known serious medical conditions were placed in facilities with adequate medical resources, which occurred in part due to Corizon's failure to review the medical needs of inmates with serious medical conditions or make adequate treatment and/or housing decisions.

146.     After noting Mr. Flores suffered a recent broken jaw, Corizon failed to conduct any follow up treatment for Mr. Flores, and this constituted a deliberate indifference to Mr. Flores's health, person, and constitutional rights.

147.     Corizon failed to conduct any review of what medical care Mr. Flores would need at Rikers or after his transfer, nor did Corizon attempt to provide guidance on where Mr. Flores was transferred, and this constituted a deliberate indifference to Mr. Flores's health, person, and constitutional rights.

---

[4]Mark G. Peters, *DOI Report finds Significant Breakdowns by Corizon Health, Inc.*, DOI Press Release (June 10, 2015), http://www1.nyc.gov/assets/doi/downloads/pdf/2015/June15/pr16corizonrpt_61015.pdf

148.    As a direct and proximate result of being denied his constitutional rights, the plaintiff has suffered injuries and damages as set forth above.

149.    The unlawful conduct of defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## FOURTH CLAIM FOR RELIEF

### LIABILITY OF
### DAMIAN
### FOR CONSTITUTIONAL VIOLATIONS

150.    The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

151.    At all times material to this complaint, defendant Damian had de facto policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

152.    By focusing on cost-cutting, Damian ensured that inmate patients would be neglected.

153.    Even simple matters, such as ensuring that Mr. Flores was taken to his already-scheduled follow up appointment at an outside medical facility, was de-prioritized to save money.

154.    Mr. Flores' care was interrupted or stopped as a result.

### FIFTH CLAIM
### LIABILITY OF
### THE CITY OF NEW YORK
### FOR CONSTITUTIONAL VIOLATIONS

155.    The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

156.    At all times material to this complaint, defendant The City of New York had de facto or actual policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged.

157.    Several entities have conducted major investigations into patterns of abuse by DOC staff on Rikers Island, including the United States Attorney's Office for the Southern District of New York, the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, and the New York Times.

158.    The problems at Rikers Island are of such a magnitude, The City of New York announced they intend to shut down the whole jail complex.  Former Chief Judge Jonathan Lippman and City Council Speaker Melissa Mark-Viverito had this to say, "Rikers Island is an affront to the civic values of New York City. Reforming our jail system and closing Rikers Island is not simply good public policy — it is a moral imperative."[5]

## THE CONTRACT - INDEMNIFICATION

159.    Defendant The City of New York, entered into a contract with Corizon guaranteeing The City of New York would indemnify Corizon from litigation.

160.    Entering into this contract was an act of defendant The City of New York and constituted the defendants' policy.

161.    Delegating prisoners' medical care to Corizon - a for profit entity with a glaringly deficient record - and guaranteeing to pay for any lawsuits which resulted from Corizon's glaringly deficient medical care disincentivized Corizon from taking

---

[5]Jonathan Lippman and Melissa Marl-Viverito, *Closing Rikers Island Is a Moral Imperative*, NY Times (March 31, 2017), https://www.nytimes.com/2017/03/31/opinion/closing-rikers-island-is-a-moral-imperative.html?rref=collection%2Ftimestopic%2FRikers%20Island%20Prison%20Complex&action=click&contentCollection=timestopics&region=stream&module=stream_unit&version=latest&contentPlacement=4&pgtype=collection

appropriate measures to safeguard constitutional rights and guaranteed prisoners at Rikers Island would be subjected to unconstitutional medical care.

<u>THE CONTRACT –THE CITY OF NEW YORK WAS ON NOTICE THE MEDICAL CARE FROM CORIZON WAS DANGEROUS</u>

162.    The City of New York knew or should have known Corizon would provide constitutionally inadequate medical care.

163.    Despite knowledge that Corizon would provide constitutionally inadequate medical care, and further disincentivizing the provision of constitutionally adequate medical care, the City contracted with Corizon. This contact was term was from January 1, 2013 to December 31, 2015.

164.    By structuring the contract with maximum annual payments, the City incentivized Corizon to cut cost and provide inadequate medical care.

165.    The City of New York did not adequately monitor Corizon's performance of said contract.  This lack of monitoring contributed to the constitutionally inadequate medical care.

166.    Defendant The City of New York permitted, tolerated, and was likewise deliberately indifferent to the consequences of Corizon's profit-maximizing policies as detailed above, of which they knew or should have known at the time of Mr. Haley's death. The City of New York's indifference to the implications for Rikers inmates of Corizon's policies, practices, and customs were proximate causes of Mr. Flores's harm.

167.    The City of New York had a policy or practice of failing to ensure that inmates are placed in facilities with adequate medical resources.

168.    The City of New York had a policy or practice of failing to review the medical needs of inmates upon intake.

169.    The City of New York's policy or practice of failing to properly review an inmate's medical needs caused Mr. Flores harm by failing to provide him necessary medical treatment for  a serious known medical condition.

170.    The City of New York's policy or practice of failing to properly review an inmate's medical needs caused Mr. Flores to suffer harm from the serious injury he had suffered by the NYPD at the time of his arrest.

171.    The policies, practices, customs, and usages, and the failure to properly train, screen, supervise, or discipline, were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of the constitutional rights of plaintiff as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth. Eighth and Fourteenth Amendments.

172.    As a direct and proximate result of being denied their constitutional rights the plaintiff has suffered injuries and damages.

173.    The unlawful conduct by defendants described herein was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## SIXTH CLAIM

## FAILURE TO INTERVENE

174.    The plaintiff restates all allegations of this Complaint herein.

175.    Each of the police officer defendants were present and viewing the interactions between the undercover officer and Mr. Flores.

176.    To the extent that some of the defendant officers did not personally use excessive force against the plaintiff , such defendant officer was present when excessive force was used and observed it being used unnecessarily on the plaintiff.

177.    Those Defendants had a duty and an opportunity to prevent the use of excessive force, and to prevent the plaintiff's injuries.

178.    The Defendants each also had a duty to prevent the plaintiff's deprivation of a fair trial.

179.    The Defendants failed to do so.

180.    As a result, plaintiff suffered personal injuries, loss of liberty, emotional distress, and other harms.

181.    As a result of Defendants' conduct, plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### DEPRIVATION OF RIGHT TO FAIR TRIAL AND PROCESS

182.    The plaintiff restates all allegations of this Complaint herein.

183.    Defendants Jason Petri and UC CO125 acted as investigating official with respect to the plaintiff's arrest.

184.    Defendant SGT. DUPLESSIS was present during the investigation and undercover operation.

185.    Both Defendants Jason Petri and UC CO125 fabricated evidence in the form of false testimony concerning the plaintiff's conduct and Defendant SGT. DUPLESSIS knew the information was false when he approved it.

186.    The false evidence was likely to influence the decision or a jury or fact-finder in a parole revocation proceeding.

187.    Defendants Jason Petri and UC CO125 forwarded the fabricated statements to prosecutors in both such proceedings.

188.    The plaintiff suffered a deprivation of liberty as a result.

189.    As a result of Defendants' conduct, plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

**WHEREFORE**, plaintiff demands the following relief jointly and severally against all defendants:

a. Compensatory damages;

b. Punitive damages;

c. The convening a jury to consider the merits of the claims herein;

d. Pre- and post-judgment costs, interest and attorney's fees; and

e. Such other and further relief as this court may deem appropriate and equitable.

DATED:      New York, New York
            December 22, 2017


Respectfully submitted,

_____

Wylie M. Stecklow, Esq.
Stecklow & Thompson
217 Centre Street, 6th Floor
New York, N.Y. 10013
Phone: (212) 566-8000
Fax:    (212) 202-4952